GEORGE W. LUCKE *vs.* THE CLOTHING CUTTERS AND TRIMMERS' ASSEMBLY No. 7507, K. OF L. OF BALTIMORE CITY.

*Labor organization—Procuring discharge of Non-union employé—Liability—Appeal—Remanding cause for New trial.*

Where an employé, a non-union man, who is performing the duties of his position to the entire satisfaction of his employers, who would gladly have retained him in their service, is discharged in consequence of a threat from a labor organization that in case he is any longer retained, it will be compelled to notify all labor organizations of the city that the business house of the employers is a non-union one, and thus subject them to great loss, such interference by the labor organization is wrongful, and an action will lie against it by the non-union employé for the damages he has sustained in consequence of such discharge.

Section 37 of Article 23, of the Code, in authorizing the formation of trade unions "to promote the well-being of their every day life, and for mutual assistance in securing the most favorable conditions for the labor of their members, and as beneficial societies," did not mean that such promotion was to be secured

JANUARY TERM, 1893.          397

Lucke *vs.* Clothing Cutters & Trim. Assembly No. 7057, K. of L.

by making war upon the non-union laboring man, or by any illegal interference with his rights and privileges.

Where the declaration fails to state a cause of action, to which the evidence is legally applicable, and there is a substantial variance, the judgment of the lower Court must be affirmed, but it appearing that upon a proper amendment of the declaration, there is evidence in the cause legally sufficient to be submitted to a jury, the case will be remanded for a new trial, in accordance with section 20 of Article 5, of the Code.

APPEAL from the Superior Court of Baltimore City.

The case is stated in the opinion of the Court.

The cause was argued before ALVEY, C. J., ROBINSON, BRYAN, FOWLER, ROBERTS, and McSHERRY, J.

*William L. Marbury,* (with whom was *William L. Hodge,* on the brief,) for the appellant.

*Wm. Pinkney Whyte,* for the appellee.

On the rights of trade unions, the extent to which they may lawfully go in furtherance of their purposes, and on what amounts to intimidation, the following authorities were referred to: *Curran vs. Treleaven,* 2 *Q. B. Div.,* (1891,) 545; *Commonwealth vs. Hunt, and others,* 4 *Met.,* 111; *Bowen vs. Matheson, and others,* 14 *Allen,* 499; *Snow vs. Wheeler,* 113 *Mass.,* 179; *Payne vs. Western & A. R. R.,* 13 *B. J. Lea,* 507; *Johnston Harvester Co. vs. Meinhardt,* 60 *How. Pr.,* 171; *Master Stevedores' Association vs. Walsh,* 2 *Daly,* 5; *Nichol vs. Martyn,* 2 *Espinasse,* 733.

ROBERTS, J., delivered the opinion of the Court.

This is an action brought by the appellant to recover damages for the wrongful and malicious interference of the appellee, by which he was discharged from his em-

398          MARYLAND REPORTS.

Lucke *vs.* Clothing Cutters & Trim. Assembly No. 7057, K. of L.

ployment in the New York Clothing House, and prevented the free exercise of his trade and occupation, and thereby deprived of his means of livelihood. It appears from the testimony produced on the part of the appellant in the Court below, that the trade of the appellant was that of a "*customs cutter,*" that is one who took the measure of customers desiring to have clothing made to order, cut the material according to measurement, and fit the same on the customer. This had been his trade for twenty years, and he was a thoroughly skilled man in his trade, and had since the year 1860 been a citizen of Baltimore City. In August, 1891, he was employed by Rosenfeld Brothers, (trading as the New York Clothing House) as a customs cutter, at a salary of thirty dollars a week. At the time of his employment he was assured by Rosenfeld Brothers that in the event of his work proving satisfactory to them, they would give him permanent employment. Subsequently his employers informed him that they were entirely satisfied with him, and that they would retain him in their service as long as he might choose to remain. Shortly thereafter Isaac Rosenfeld, one of the members of the firm of Rosenfeld Brothers, called his attention to the fact that certain members of the appellee corporation were complaining of his employment, on the ground that he was a non-union man, that is, he was not a member of the appellee, which is a labor union, and a branch of the general organization known as the K. of L., or Knights of Labor; thereupon the appellant expressed his willingness to become a member of the appellee, and requested a witness, named Franz, who testified at the trial below, and who was a member of the appellee in good standing, to present his application, as the appellee being a secret organization, he could not obtain access to its meetings, for the purpose of presenting the application in person. The appel-

lant had been informed by several members of the appellee, that the manner in which he had made his application, was the only way in which it could be done. Franz subsequently informed the appellant that he had made application to the appellee for his admission, but the appellee could not act on it that night, which was in the early part of December, 1891, owing to the fact that they had too many *union* men out of employment, but that they would act on it in February; that in February, about a week before the appellant was discharged, a committee of certain members of the appellee called at the New York Clothing House to inquire about the matter of the appellant's employment while he was a non-union man; one of the committee was Michael, the Master Workman of the appellee, whose position in the organization was equal to that of president; the committee spoke to the appellant concerning his not being a member of the appellee, when he stated then that he had made application for membership through one of their members, and expressed his willingness to join their organization; they then informed him that everything would be satisfactory, and said that they would see that everything would be properly attended to, and went away leaving the appellant under that impression. The appellant heard nothing further until the following Saturday, when one of the firm of Rosenfeld Brothers exhibited to him a notice which the firm had received from the appellee, as follows:

"Clothing Cutters and Trimmers,
L. A. 7507, K. of L.
BALTIMORE, *February* 16, 1892.

"MESSRS. ROSENFELD BROS.

"*Gentlemen:*—Clothing Cutters and Trimmers L. A. 7507, K. of L. do herewith desire to inform you, that in case the non-union man, whom you have in your em-

400        MARYLAND REPORTS.

Lucke *vs.* Clothing Cutters & Trim. Assembly No. 7057, K. of L.

ploy is any longer retained, we will be compelled to notify all labor organizations of the city, that your house is a non-union one.   Trusting you may give this matter due consideration,

We are respectfully yours,

Clothing Cutters and Trimmers,

L. A. 7507, K. of L.

JNO. G. NAGENGAST, *Secretary.*''

That upon receiving said notice the said firm immediately notified the appellant that he would have to go, and did in fact discharge him from their employ, at the same time notifying the appellee of their action by sending them the following letter:

''Office of New York Clothing House,

102 and 104 East Baltimore Street,

Opposite Light Street.

BALTIMORE, *February* 18, 1892.''

''JOHN G. NAGENGAST, ESQ.,

No. 31 S. Washington, city.

''*Dear Sir:*—Your letter received, and your request will be granted, the gentleman referred to, will be discharged Saturday night.

Yours respectfully,

ROSENFELD BROS.,

''Cutters and Trimmers.''          J. W. Frey.''

The appellant further proved that at the time of his discharge his employers were entirely satisfied with his work, and anxious to retain his services; that at the suggestion of his employers he went to see Mr. Michael, the Master Workman, and asked him why he had been treated in the way he had; Michael responded that he knew it was a wrong being done him, but that the appellee had passed a resolution not to accept any more mem-

bers, and that was the only ground of their action, and they did so because there were so many union men out of employment; that he, Michael, had made an effort to procure a repeal of the resolution, but had been unable to do it.  Michael informed the appellant that there was no objection to his becoming a member of the appellee.  The appellant further proved that he was never informed by any one that it was necessary for him to appear before an examining board, or to take any further steps, or to do anything further than he had done, in order that he might become a member of the appellee. Appellant was a married man, and after his discharge, he made every effort he could to obtain work, but after the action taken by the appellee it was impossible for him to secure a position with any of the clothing houses, and at the time of his discharge he was unable to procure service with the merchant tailors, owing to its being their dull season, and he did not, until the following April, obtain employment which was from a merchant tailor, at five dollars a week less than he received from Rosenfeld Brothers; that he had been employed by Rosenfeld Brothers by the week, but after he had been there awhile he was told that his employment was permanent, but that they had the right to discharge him at the end of any week.  It was in proof by one of the Rosenfeld Brothers that the appellant was a first class "customs cutter," that he "filled the bill exactly," and that their firm were entirely satisfied with him, and would not have discharged him but for the objection of the appellee; that they discharged him on account of the letter received from appellee, dated February 16th, and by letter dated February 18th, they notified the appellee of the receipt of its letter, and stated that "its reque st would be granted, and the gentleman referred to will be discharged Saturday night;" to which there was no reply by the appellee.  Witness further proved that in

his opinion as a consequence of the failure of his firm to discharge the appellant, their patronage would have fallen off to the extent of organized labor, and that all the union cutters would have been ordered out, and that it would have gone still further than that; that not only the people who cut the material, but those that sewed on the work, would have been stopped from cutting or sewing for us, and if the union men in our employ at the time the appellant was discharged, had been called out, and left, the effect would have been to cause us great loss, as we had on hand at that time a number of contracts.

The appellee then offered evidence tending to prove that the by-laws of the organization required application for membership to be made in a certain manner, with which the appellant had not complied; that the local law of the appellee and the general law of the Order of the Knights of Labor, prohibited the calling out of their members, because of the employment of non-union men. It was also testified on the part of the appellee, that in talking to Mr. Rosenfeld, no one had used fraud or intimidation in regard to calling out members if he did not make the New York Clothing House a union house. The appellee then had a membership of five hundred.

In the month of January, 1891, the firm of Rosenfeld Brothers had promised the appellee that they would employ none but union men, provided the appellee would include the New York Clothing House among the names of those houses, which the appellee was publishing monthly in the *Critic*, a paper devoted to the interest of labor organizations, the publication of said names was as follows:

"The Critic.
Saturday, February 14th, 1891.
Issued Monthly, February, 1891.
To Organized Labor."

"All members of labor organizations are most respectfully urged to buy or have their clothes made by the clothiers named in this advertisement, and to use their influence among their friends to follow their example. The prices of these firms will be found as low as non-union firms, and the work will be more reliable and satisfactory.

"Clothing Cutters and Trimmers' Assembly, 7507, K. of L., takes pleasure in recommending to members of labor organizations, and all friends of labor generally, the following named firms, whose work is cut and trimmed by members of L. A., 7507, K. of L." Then follows the names of nine houses of which the New York Clothing House was one. The statement is formally signed by "Frank Armiger, Master Workman, and J. G. Nagengast, Recording Secretary."

Appellee further proved that the effect of the refusal of the New York Clothing House to discharge the appellant upon receiving the appellee's letter of February 16th, 1892, would have been to cause the withdrawal by the appellee of said house's name from the list of those advertised in the *Critic*.

These are the facts, a full statement of which is necessary to a proper understanding of the merits of the controversy, and the disposition of the same. The case was taken from the consideration of the jury by the prayers granted at the instance of the appellee, on the ground that there was no evidence in the cause legally sufficient to entitle the appellant to recover in this action, which, in legal effect, is nothing more than a demurrer to the evidence. We are therefore to inquire whether the Court below committed error in granting the instructions asked for, by which the case was taken from the jury.

The appellant's engagement with Rosenfeld Brothers as a "customs cutter," commenced in the month of

404    MARYLAND REPORTS.

Lucke *vs.* Clothing Cutters & Trim. Assembly No. 7057, K. of L.

August, 1891, and continued to the month of February, 1892, and was to continue as long as his work proved satisfactory. His work gave entire satisfaction to his employers who, however, retained the right to discharge him at the end of any week; but a member of the firm testified that they would not have discharged him but for the objection of the appellee. The appellee on the 16th day of February, 1892, sent Rosenfeld Brothers a written notice informing them, "that in case the non-union man whom they had in their employ was any longer retained, it would be compelled to notify *all labor organizations* of the city that their house was a non-union one." How many similar organizations there were in the city the record does not disclose, but the membership of the appellee is five hundred. This notice the Rosenfeld Brothers construed to mean, that if they retained the appellant in their employ, they would lose the patronage of the labor organizations, and that the union labor which they then employed would be ordered out, or they would have to quit work, the effect of which, as testified by Mr. Rosenfeld, would have been to cause his firm great loss, in consequence of their having a number of contracts on hand at that time.

There are several inquiries which arise out of the facts just stated:

*First.* Had the appellee justifiable cause in pursuing the course which it did in threatening said firm, that if they retained the appellant any longer in their employ, it would be compelled to notify all labor organizations of the city, that their house was a "non-union house"?

*Second.* Was the conduct of the appellee in the course pursued by it towards the appellant wrongful or malicious?

*Third.* Had Rosenfeld Brothers reasonable ground to anticipate loss or injury to themselves in consequence of the action of the appellee?

The first and second propositions can be considered together, as they are somewhat reciprocal in the relation they bear to each other.  It is contended on the part of the appellee that it did not, by sending the notice of February 16th, to Rosenfeld Brothers, contemplate any such course as that which has been attributed to it, and that the local law of the appellee, and the general law of the Order of the Knights of Labor, prohibited the calling out of their members because of the employment of non-union men.  If this be so, how are we to interpret the meaning of the written notice ?  What purpose did the appellee have in sending it, and what design was through its agency, sought to be accomplished ?  This was no idle play in which they were involved.  It related to the most serious right affecting a laboring man's life, which was the privilege of seeking remunerative employment and thereby gaining an honest livelihood.  Is it not unquestionably true that, but for the interference of the appellee, the appellant would not have been discharged ?  It is not necessary that such interference should have been malicious in its character.  If it be wrongful, it is equally to be condemned, and just as much in violation of legal right.  In this case, we think the interference of the appellee was in law malicious and unquestionably wrongful.  The appellant was a man of family, a good workman, engaged in a lawful pursuit, performing his duties in an entirely satisfactory manner, without objection in any respect, and willing and desirous of becoming a member of the appellee if an opportunity had been afforded him.  He was not able to obtain membership with the appellee, nor was he permitted to continue his work with his employers, who would gladly have retained him in their service, if they could have done so without loss or embarrassment to themselves.  Can it then be seriously questioned, that from the evidence in this cause the appellee intended or expected any other or different

result from the sending of the written notice than that which followed its reception by Rosenfeld Brothers? We are compelled to say that the notice had some meaning and purpose, and if not that which we have suggested, what was it ?

The testimony in this cause assigns no other motive, and there is not the slightest intimation from any source that there is any. If, therefore, the appellee sought to bring about the discharge of the appellant under the circumstances detailed in the evidence, if not malicious, it was certainly wrongful, and by so doing it has invaded the legal rights of the appellant for which an action properly lies. It is further contended by the appellee that it only meant by the notice sent Rosenfeld Brothers to say, that unless they discharged the appellant, it would withdraw the name of the New York Clothing House from the list of houses published in the *Critic*, which list had annexed to it a statement recommending said houses to the patronage of organized labor. Yet even this view of the letter contemplated the discharge of the appellant, and necessarily concedes that the sole purpose of the letter was to accomplish the appellant's discharge. In no view of the facts of this case have we been able to ascertain where the appellee derived its right to obtain, by the means adopted, the discharge of the appellant from his position with Rosenfeld Brothers. The provisions of law authorizing the creation of the appellee corporation provides for the formation of trade unions "to promote the well being of their every day life, and for mutual assistance in securing the most favorable conditions for the labor of their members and as beneficial societies." Code, Art. 23, sec. 37.

But when the State granted its generous sanction to the formation of corporations of the character of the appellee, it certainly did not mean that such promotion was to be secured by making war upon the non-union

laboring men, or by any illegal interference with his rights and privileges. The powers with which this class of corporations are clothed are of a peculiar character, and should be used with prudence, moderation and wisdom, so that labor in its organized form, shall not become an instrument of wrong and injustice to those who, in the same avenue of life, and sometimes under less favored circumstances, are striving to provide the means by which they can maintain themselves and their families. It is essential to good government and the peace of society that correct legal principles be applied in the consideration of all questions ; for it is undeniably true that wrong principles cannot and never do produce salutary remedies.

The third proposition can be disposed of without extended comment. We think Mr. Rosenfeld in his testimony has fairly and intelligently answered this inquiry. His long experience in business, and accurate knowledge of the various methods in vogue for the employment of labor in clothing houses, eminently qualify him to say whether his firm had just cause to apprehend the consequences of a refusal, under the circumstances, to discharge the appellant.

Viewed by the light of all the circumstances surrounding the case, we are compelled to say that there was reasonable cause to apprehend the result stated by Mr. Rosenfeld in his testimony.

"Courts are bound to look at things just as they are, to pass on facts just as they are developed, to treat the conduct of men just as it is, and to impute to them that intention which their acts and their conduct disclose was their intention." *United States vs. Kane*, 23 *Federal Reporter*, 750.

Some criticism was indulged in in the argument of counsel in this Court to the effect that a recovery could not be had in this cause, as the appellant had only

408        MARYLAND REPORTS.

Lucke *vs.* Clothing Cutters & Trim. Assembly No. 7057, K. of L.

declared on a supposed violation of a contract, when in point of fact there had been no contract violated. We concur in this view, and are clearly of opinion that the declaration sets out a cause of action, which the proof fails to sustain. The question of a contract *vel non* enters into the consideration of this case, but upon proper averment in the declaration ought to play but small part in its determination. "Where a contract would have been fulfilled, but for the false and fraudulent representations of a third person, an action will lie against such person, although the contract could not have been enforced by action." *Benton vs. Pratt*, 2 *Wendell*, 385. In the case of the *Johnston Harvester Co. vs. Meinhardt*, 9 *Abbott's New Cases*, 396–397, the Court said : "A distinction has been sought to be made between the cases where there has been an unexpired time contract, and cases where the services were by the day or by the piece, but I do not think such distinction rests upon any sound reason. * * * In such case the injury to the property and business of the employer would not consist so much in breaking the contract which existed, as in the loss of profits derived from the work of the laborer if he continued in the employment, *and the probability or certainty of such loss would be in each* case a question of fact;" and, of course, for the jury.

Mr. *Addison* in his work on *Torts, fol.* 9–14, thus summarizes the law: "Interference by fraud or force with the free exercise of another's trade or occupation, or means of livelihood is a tort—such as preventing people, by the use of threats or intimidation, from trading with the plaintiff's vessel in a foreign port, or dealing at the plaintiff's shop, or sending their children to the plaintiff's school, or placing obstructions or impediments in the way of free access to the plaintiff's place of business * * * Where a violent or malicious act is done *to a man's occupation, profession, or way of getting*

JANUARY TERM, 1893. 409

Lucke vs. Clothing Cutters & Trim. Assembly No. 7057, K. of L.

a livelihood, there an action lies in all cases." Considerable comment was made at the hearing in this Court of the analogy supposed to exist between the case made by the record in this cause, and the case of *Lumley vs. Gye*, 2 *Ellis & Black.*, 216, but the cases widely differ in important facts, and there is but small analogy in the principles of law properly applicable in each case. The principles of law which are entitled to recognition in this case are too well settled and determined in a multitude of cases to require numerous citations for their support. The case of *Chipley vs. Atkinson*, 23 *Florida*, 206, is strikingly like the case now under consideration. The Court in that case says: "From the authorities referred to, and upon principle, it is apparent that neither the fact that the term of service interrupted is not for a fixed period, nor the fact that there is not a right of action against the person who is induced or influenced to terminate the service or to refuse to perform his agreement, is of itself not a bar to an action against the third person maliciously and wantonly procuring the termination of, or a refusal to perform, the agreement. It is the legal right of the party to such agreement to terminate or refuse to perform it, and in doing so he violates no right of the other party to it; but so long as the former is willing and ready to perform it, it is not the legal right, but is a wrong on the part of a third party maliciously and wantonly to procure the former to terminate or refuse to perform it. Such wanton and malicious interference for the mere purpose of injuring another, is not the exercise of a legal right. Such other person who is in employment by which he is earning a living, or otherwise enjoying the fruits and advantages of his industry, or enterprise or skill, has a right to pursue such employment undisturbed by mere malicious or wanton interference or annoyance. Every one has a perfect right to protect or advance his business,

if in so doing he infringes no superior legal right of another.''

In *Bowen vs. Hall, L. R.,* 6 *Q. B. D.,* 338, it was said by BRETT, J., (Lord SELBORNE concurring,) that "merely to *persuade* a person to break his contract may not be wrongful in law or fact. * * * But if the persuasion be used for the indirect purpose of injuring the plaintiff, or of benefitting the defendant at the expense of the plaintiff, it is a malicious act, which is in law and fact a wrong act, and therefore a wrongful act, and therefore an actionable act, if injury follows from it.''

The appellant by the action of the appellee lost his place in the month of February, and although persistently in quest of a position, he did not succeed in obtaining work until the following April, when he secured employment with a merchant tailor at five dollars less per week than he was receiving when he was discharged. It would be strange indeed, if the law under such a state of facts as this record exhibits, provided no remedy. In *Winsmore vs. Greenbank. Willes Rep.,* 581, it is said: "A special action in the case was introduced for the reason that the law will never suffer an injury and a damage without a remedy.''

Whilst we are of opinion that the evidence in the cause clearly establishes a legal cause of action in the appellant, we do not think he has framed his declaration to meet the testimony which he has offered. In the case of *Chipley vs. Atkinson, supra* 218–19, from which we have just quoted, the Court says: "The case made by the declaration is that the employment was under an agreement by which it was to be continued for a long period of time. An agreement between the plaintiff and Kehoe and Walker for the continuance of the employment for a long period of time cannot be ignored as a feature of the case. This allegation means that the agreement entered into by them, entitled the plaintiff, either ex-

pressly or by implication, to employment, not only for a period of time, but for a long period. It means that a period of time was agreed upon by them, and means that the period thus agreed on, was, whether limited by months or years or otherwise, to be proved. The language implies that there was at least some point of time in the future, ascertainable from the terms of the agreement, up to which, the employment was to extend. That the continuation of the employment for any time was dependent upon the condition of a satisfactory performance of his duties by the plaintiff, would not be inconsistent with an employment for a particular period. If there was no agreement for any particular period of time, but the employment was one in which the agreement was that plaintiff should be given employment as long as he performed his work satisfactorily, and he has been discharged from it solely through the malicious and wrongful procurement of the defendant, and injury has resulted, he should have laid his case accordingly, but such is not the averment here."

We are therefore of opinion that upon proper amendment of the declaration there is evidence in the cause legally sufficient to be submitted to a jury, but, because the declaration fails to state a cause of action, to which the evidence offered is legally applicable, and there is a substantial variance therein, we must affirm the judgment of the Court below; but, it appearing to the Court that a new trial ought to be had, we will remand the case to the end that the same may be again tried, in accordance with Art. 5, sec. 20, of the Code.

> *Judgment affirmed, and cause remanded*
> *for a new trial; costs to be paid by*
> *appellee.*